VANDERHORST v. FIRST NATIONAL BANK OF EATON
RAPIDS.

1. FRAUD—WEIGHT OF EVIDENCE.
   In an action for fraud and deceit in the sale of bonds
   by defendants to plaintiff, the finding of the trial judge
   that there was no fraud or deceit, *held*, against the clear
   weight of the evidence.

2. EVIDENCE — CONFLICTING TESTIMONY — UNDISPUTED FACTS AND
   SURROUNDING CIRCUMSTANCES SHOULD BE CONSIDERED.
   When only two witnesses are sworn and they differ in
   their testimony as to a conversation material to the issue,
   it is the duty of the jury or court to consider the un-
   disputed facts, the circumstances surrounding the trans-
   action, any inconsistencies, evasions or self-contradictions,
   and the probability of truth, in view of the entire testi-
   mony presented.

WIEST, MOORE, and STEERE, JJ., dissenting.

Error to Eaton; Smith (Clement), J.   Submitted
April 25, 1922.   (Docket No. 103.)   Decided July
20, 1922.

Case by Henry L. Vanderhorst against the First
National Bank of Eaton Rapids and another for fraud
and deceit.   Judgment for defendants.   Plaintiff
brings error.   Reversed.

*Alfred J. Mills,* for appellant.

*Peters & Marshall,* for appellees.

WIEST, J. (*dissenting*).   Plaintiff brought this ac-
tion to recover damages for alleged fraud and deceit
practiced upon him by the defendant Hamlin, acting
in behalf of defendant bank, in the sale to him of
some bonds.

At the trial the court made the following findings of fact:

"1. That defendant bank, on January 21, 1916, was indebted to plaintiff for the balance due him for building a bank building in Eaton Rapids, the sum of $3,585, and on that date defendant Hamlin, representing said bank, and also being an officer of said bank, went to Kalamazoo to settle said debt. That in such settlement, he paid to said plaintiff four bonds of the Iron Mountain (Light) & Fuel Company, each of the denomination of $500 and numbered, as follows: 204, 205, 209, 285, each of date January 1, 1912, in part payment of said indebtedness, at the price of $1,800.

"2. That there was no fraud or deceit on the part of said Hamlin in disposing of the same and that they were turned over to said plaintiff in good faith by said Hamlin in part payment of said debt.

"3. Later, and on January 1, 1917, the Iron Mountain (Light) & Fuel Company defaulted in the payment of the semi-annual interest on said bonds and on February 27, 1917, a foreclosure of the mortgage given to secure the payment of the said bonds issued by said company, in all $143,000, was commenced and said suit proceeded to a decree and sale under said decree of the property so mortgaged, the sale occurring on the 18th day of June, 1918, and said property was sold for $8,500."

Upon such findings judgment was entered for defendants. The findings are conclusive unless against the clear weight of the evidence. 3 Comp. Laws 1915, § 12587.

If plaintiff's testimony is accepted and defendant Hamlin's testimony rejected or only isolated portions thereof considered, then fraud was perpetrated. If the whole of defendant Hamlin's testimony is accepted then no actionable fraud was perpetrated. Plaintiff claimed that defendant Hamlin told him the bonds were good and guaranteed them to be good. Mr. Hamlin denied making any guarantee and claimed that plaintiff asked him if he thought the bonds were all right and:

"I told him I thought they were.  I had had some quite a while and the coupons were cashed readily.  I told him that Mr. Olds had recently invested a lot of money in it and sent an expert, the old State accountant, down there, Mr. Humphrey, who spent about four weeks in looking it over after Mr. Olds took over the property and I based my judgment on that more than anything else.  I told Mr. Vanderhorst so.  I can't remember definitely what else I said to him.  I told him that I thought the franchise alone up there at Iron Mountain was worth a lot of money, possibly a half a million, on account of the fine franchise. They had a 30-year franchise with a monopoly of all gas and fixtures and stoves, everything of that kind, they were getting the benefit of and there couldn't anybody buy a stove in town without they bought it of them."  *   *   *

He also testified:

"I knew absolutely nothing about the standing of the affairs of the company of my own knowledge.  I did not know whether the bonds were good, bad or what, except that they paid their coupons.  *   *   * I had absolutely no personal knowledge of the condition of this company.  I did not represent to the plaintiff that I had a personal knowledge.  *   *   * I had no information at that time, was not aware or suspicious of these bonds, or of the fact that they were not good.  I had every faith that they were good.  *   *   * I just showed the bonds, told him they were good bonds and he took them without any further inquiry at 90 cents on the dollar.  *   *   *

"Q. Didn't you tell him they were good?

"A. I think very likely I did.

"Q. Didn't he, just after you said the bonds were good, didn't he say to you in substance if those bonds were good and you said so and it would help the bank out any he would take $2,000 in them?

"A. I think he did."

If the opinion expressed by Mr. Hamlin was coupled with the facts upon which it was based then all that went with the opinion must be considered.  The record does not dispute any of the alleged facts given

by Mr. Hamlin as the basis for his opinion. If defendant Hamlin gave plaintiff the source and extent of his information about the company and upon which he had formed his opinion as to the value of the bonds then plaintiff had no right to treat such information as a bald assertion of the value of the bonds. The dividing line between an assertion of fact, upon faith in which one is induced to act to his loss, and a mere opinion, based on honest belief, with the facts upon which it rests fully and fairly disclosed, is apparent. The first imports absolute verity and may be accepted and acted upon, and, if untrue in fact and damage follows because of faith reposed therein, actionable fraud exists.

The second carries upon its face its only evidence of verity, and if the facts disclosed are truly related the opinion is but an expression upon such facts and can be accepted and acted upon for no more than its apparent worth. Plaintiff and defendant Hamlin were the only witnesses in the case. We cannot hold the findings to be against the clear weight of the evidence.

It is urged that, upon the facts as found, the court was in error in entering judgment for defendants. We do not think so. We cannot disturb the findings of fact. Upon the facts found the judgment entered was right. The several errors assigned are all disposed of by the above holding.

The judgment should be affirmed, with costs to defendants.

MOORE and STEERE, JJ., concurred with WIEST, J.

SHARPE, J. A careful reading of this record satisfies me that the finding of the trial court—

"That there was no fraud or deceit on the part of said Hamlin in disposing of the same (the bonds in question) and that they were turned over to said

plaintiff in good faith by said Hamlin in part payment of said debt"—

is against the clear weight of the evidence.   But two witnesses were sworn, the plaintiff and the defendant Hamlin.   The facts on which they agree and the circumstances surrounding the transaction tend strongly to support plaintiff's claim.

The bank owed plaintiff $3,585 as a balance due him on a construction contract.   No question is raised as to the ability of the bank to make payment.   Had not plaintiff accepted the bonds in part payment, it is apparent that Mr. Hamlin would at that time have paid him the balance due.   Plaintiff was a contractor and builder.   He had no money to invest in securities.   He told Mr. Hamlin that if he took the bonds he would have to dispose of them again.   Soon after receiving them, he used them as collateral to a loan in the bank at which he did business.   He was under no obligation to accept anything but money in payment of what the bank owed him.   The bonds in question were issued by the Iron Mountain Light & Fuel Company.   Mr. Hamlin had at one time been a director of the company, as had also several other residents of Eaton Rapids.   He had purchased some of the bonds himself, paying for them 80 per cent. of their par value and receiving in addition to the bonds 50 per cent. of their face value in stock of the company.   The bank did not own these bonds.   They held them as security for a loan to the Iron Mountain company which had been made "a couple of years anyway, maybe longer" before that time.

Let us now examine the testimony of these two witnesses wherein they disagree.   Mr. Hamlin testified: "He asked me if I thought the bonds were all right. I told him I thought they were."   He then states that he explained to plaintiff why he thought them good as set forth in the opinion of Mr. Justice WIEST.

219—Mich.—27.

"I did not tell him what they cost the bank— were bought at 90. The bank never bought them. I never told him it had. * * * The bank never owned any of the bonds. They had them as collateral to a loan. * * * The bank sold the collateral. We had the option and privilege of doing so. We sold four of the bonds to take up the note * * * We had the right to sell it at public or private sale, with or without notice, and exercised the option given by the note to sell the bonds. The note was paid when we sold them. The Iron Mountain Light & Fuel Company did not default in the payment of their note. We sold the collateral before the note became due. * * * The sale was, I think, three or four months before that. * * * I went to Kalamazoo to settle with Mr. Vanderhorst, because I wanted to turn those bonds any time I could. * * * *I did not in my negotiations with the plaintiff represent to him that these bonds had cost the bank of Eaton Rapids 90 cents on the dollar, or that the bank owned the bonds.* * * * *I told him at what they stood us in and we would let him have them for that.* The bonds were held as collateral on a note to the company that issued the bonds. * * * I didn't tell Mr. Vanderhorst the bonds belonged to the Eaton Rapids bank, nor did I tell him I owned the bonds. Nothing was said about that at all. I just showed the bonds, told him they were good bonds and he took them without any further inquiry at 90 cents on the dollar. * * * Those loans were never approved by the directors. They were made by the old cashier without consultation. I was trying to clean them up when I got Mr. Vanderhorst to take these four bonds. That was part of my errand."

On being recalled, he testified in answer to a question by his counsel:

"*Q*. Mr. Vanderhorst just testified that he stated to you if you would guarantee those bonds to be all right he would take them. Was there any statement of that kind made there?

"*A*. No, sir. I did not warrant or guarantee them. He did not ask me to do so."

On recross-examination, the witness testified:

"*Q.* You say he did ask you if the bonds were good?
"*A.* He asked me what they were.
"*Q.* He asked you if they were good, didn't he?
"*A.* I told him they always had been as far as I had known them.
"*Q.* Didn't you tell him they were good?
"*A.* I think very likely I did.
"*Q.* Didn't he, just after you said the bonds were good, didn't he say to you in substance if those bonds were good and you said so and it would help the bank out any he would take $2,000 in them?
"*A.* I think he did."

The plaintiff testified:

"He (Mr. Hamlin) said the bank was hard up for money, that if I could help them out, it would relieve him somewhat if I could take some of these bonds. He did not show them to me until afterwards. He said he wanted to sell them to me. I said, 'No, I am buying no bonds; I am hard up borrowing money at the bank' and that if I took any bonds I would have to try to dispose of them again. He said it would help him out, that he came there in anticipation of unloading $3,500. I said, 'No, I don't care to take any more, what kind of bonds are they?' He said, 'Iron Mountain Light & Fuel.' I asked him what they were. I said, 'I don't deal in public utility bonds;' that I had some 15 years ago and still hold them, because I couldn't dispose of them at any price, that they were not very good. He said, 'These are good bonds.' I said, 'Are they all right?' He said, 'Yes, sir.' 'Well,' I said, 'I don't want them.' After talking a few minutes, I said, 'I will tell you what I will do, if it helps them out. You guarantee they are all right. I will take $2,000.' He said, 'You don't want to take any more of them?' I said, 'No, I wouldn't.' 'I don't want to take these bonds even, but if you say they are all right, I will take them.' I said, 'What are they?' He said, '5% bonds.' 'First Mortgage?' He said, 'Yes, sir.' I said, 'You never paid par for 5% bonds.' He said, 'No, we paid 90 for them.' I said, 'You don't certainly expect me to

pay more than that?'   He said, 'No, I will be satisfied if you give me 90.'   He said the bank was overloaded with them—more bonds than money.   I took a check for the balance."

He further testified:

"I asked him what the bonds were.   He said they were Iron Mountain Light & Fuel, something like that. I asked him whether they were good.   He said, 'Yes,' they were.   I said, 'Well, if you will guarantee them, I will take them.'   I didn't want them at first and said, 'I have got to borrow money myself.'   I said, 'In order to help the bank all right, if you say it is all right, I will take them, I will take $2,000.'   He says, 'All right, it helps the bank out that much anyway.'   Then we adjusted the balance and he gave me a check."

When but two witnesses are sworn and they differ in their testimony as to a conversation material to the issue, it is the duty of the jury or court to consider the undisputed facts, the circumstances surrounding the transaction, any inconsistencies, evasions or self-contradictions and the probability of truth in view of the entire testimony presented.   Thus viewed, I am of the opinion that the testimony of the plaintiff should be accepted as a true version of what occurred.   This conclusion is based on the following considerations:

1. The improbability of plaintiff's accepting the bonds of a public utility company, of which he had theretofore never heard, as payment on a debt admittedly owing by and collectible from the bank without relying on an assurance based on a positive statement of Mr. Hamlin that the bonds were good.

2. The fact that these bonds had been held by the bank to secure a note of the company several times renewed and the probability that, under banking law and usage, the bank examiners were insisting that the loan should be retired.

3. The desire of Mr. Hamlin as cashier of the bank to turn over these particular bonds to plaintiff as evidenced by his taking them with him to Kalamazoo when he went to make settlement with plaintiff.

4. The repeated denial of Mr. Hamlin that he told plaintiff what the bonds cost the bank and his after admission "I told him at what they stood us."

5. The testimony of Mr. Hamlin that "The bank never owned any of the bonds," but, holding them as collateral, had sold them "three or four months" before the note for which they were held as security became due.

6. The purchase by Mr. Hamlin of bonds of the same issue at 80 and his receiving therewith 50 per cent. of the par value of the bonds in stock of the company.

7. The improbability of Mr. Hamlin's being without knowledge of the financial condition of the company, the notes of which had been carried and renewed for several years in his bank and which were secured only by its bonds, particularly in view of the fact that he and other residents of Eaton Rapids had been directors in the company.

8. The duty devolving on Mr. Hamlin to inform plaintiff that the bank held the bonds as collateral to a note, several times renewed.

9. The duty of Mr. Hamlin to deal fairly with plaintiff. The bank owed him a considerable sum of money and plaintiff needed it to carry on his business. He had no information as to the Iron Mountain company or the value of its bonds and this fact was known to Mr. Hamlin. Plaintiff desired to retain the good will of the bank, but it is improbable that he would have been willing to accept these bonds in payment of the bank's indebtedness unless satisfied from what Mr. Hamlin told him that the bonds were good and

might safely be accepted by him at the price agreed upon.

10. The sale of a time security by a party, who by stress of circumstances may feel compelled to part with it at less than its full value, may not be an indication or even ground for suspicion that the security is doubtful, but the transfer by a corporation of its own security as collateral with permission to the holder to sell it at less than its face value cannot but be regarded as some indication that the security is doubtful. In such a case a prudent man of affairs, particularly if he be engaged in financial dealings, would hesitate before purchasing and make investigation unless he received assurances on which he felt he could safely rely. The fact that the company was thus parting with its securities was not made known by Mr. Hamlin to the plaintiff. I think it must be assumed that had he done so, the plaintiff would have insisted on making inquiries as to the worth of these bonds before accepting them at a price below par in payment of the debt due him from the bank. Not only did Mr. Hamlin omit to so inform plaintiff, but, as appears from his own admission, he gave him to understand that the bank had purchased these bonds at 90 and that plaintiff was accepting them at just what the bank paid for them. Banks as a rule are purchasing, not selling, securities. Unless Mr. Hamlin considered them of doubtful value as collateral to the note of the company held by the bank, we have no reasonable explanation by him of his desire to sell them to plaintiff. These considerations tend strongly to support plaintiff's claim that Mr. Hamlin "said the bank was hard up for money, that if I could help them out, it would relieve him somewhat if I could take some of these bonds."

The defendants make the claim that "there is no evidence in this record which proves these bonds

were not at the time plaintiff acquired them good and valid securities." The plaintiff requested a finding that "the said bonds were not good and reliable securities valid in all respects and were of no value." The trial court made no finding in this respect. That made by him and heretofore considered by us was decisive of his conclusion that as a matter of law plaintiff could not recover. The defendants preferred no requests. We therefore do not feel at liberty to review the proofs tending to support this contention on the part of defendants.

In my opinion the court erred in the finding quoted. It should have found as requested by plaintiff and entered judgment in his favor. The judgment entered is set aside and a new trial granted. The plaintiff will recover costs, both here and in the court below.

FELLOWS, C. J., and McDONALD, CLARK, and BIRD, JJ., concurred with SHARPE, J.